ASH

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| Julie Levitch, | No. CV 21-01418-PHX-DLR (JZB) |
|---|---|
| Plaintiff, | |
| v. | **ORDER** |
| County of Maricopa, et al., | |
| Defendants. | |

Plaintiff Julie Levitch, who is represented by counsel, brought this civil rights action pursuant to 42 U.S.C. § 1983 and Arizona state law. Defendants moved to dismiss Plaintiff's then-operative First Amended Complaint. By Order dated August 24, 2022, the Court granted the Motion, and dismissed the First Amended Complaint with leave to amend. Subsequently, Plaintiff filed a Second Amended Complaint (Doc. 43). Defendants now again move to dismiss the Second Amended Complaint. (Doc. 47). The Motion is fully briefed (Docs. 49, 56). For the reasons set forth herein, the Court will grant the Motion and dismiss this action.

**I.  Background**

Plaintiff seeks monetary relief, as well as punitive damages, for injuries allegedly arising from the publication of her mugshot and other information on the Maricopa County Sheriff's Office (MCSO) website. Plaintiff names Maricopa County and Maricopa County Sheriff Paul Penzone as Defendants; Penzone is named in both his individual and official capacities.

Plaintiff alleges that on August 22, 2020, she was wrongfully arrested and charged with "Criminal Damage—Defacing Property." (Doc. 43 at 5).[1] Upon her arrest, Plaintiff was transported to the Maricopa County Fourth Avenue Jail, where her mugshot was taken. (*Id.*). While Plaintiff was detained at the jail, her mugshot and other identifying information (including her birthdate)[2] were posted on the MCSO "Mugshot Lookup" website; the mugshot and other identifying information remained posted on the MCSO website for approximately three days. (*Id.*). Plaintiff does not allege that any of the posted information was inaccurate, and concedes that it is a public record. (*Id.* at 54).

After her mugshot and information were posted on the MCSO website, numerous online entities "scraped" the data and republished it. (*Id.* at 6). As a result, Plaintiff's mugshot and arrest record now appear "at the top of online search results for her name," causing "severe[] and permanent[] damage" to her personal and business reputations. (*Id.*). Additionally, Plaintiff has received—"to her personal email account"—"a barrage of spam emails . . . with ominous subject lines like 'Your Damaging Record,' 'Reputation Threat Alert,' and 'Someone Saw Your Criminal Record on Your Profile,'" as well as "hundreds of emails . . . from a variety of reputation management companies" that are "designed to frighten the reader and compel such person to take action by paying for reputation management services." (*Id.* at 7).[3]

Plaintiff further alleges that MCSO policy GF-3—relating to "Criminal History Record Information and Public Records"—provides that "**[i]nformation determined to be personal identifying information or locating information shall be redacted**" before publication, and that Penzone "chose to violate the redaction requirements set forth in the policy" when Plaintiff's mugshot and other information were posted on the MCSO website.

---

[1] Plaintiff's charges were later dismissed. (*Id.* at 5).

[2] Plaintiff clarifies that the identifying information included her birthdate, name, sex, weight, height, hair color, and eye color. (Doc. 49 at 2).

[3] It is unclear how these reputation management and spam entities obtained Plaintiff's personal email account, as Plaintiff makes no allegation that it was included in the information posted on the MCSO website.

(*Id.* at 10-11) (emphasis in original). Plaintiff also alleges that Penzone "was acting as a 'Mugshot Website Operator' under Arizona law, because [Penzone] enabled targeted Google AdSense advertisements to be published on the MCSO website." (*Id.* at 11-12).

Accordingly, Plaintiff alleges six claims for relief, as follows: "Invasion of Privacy and False Light; Violation of Arizona's Public Records Laws," brought pursuant to Arizona state law (Count One); "Slander, Defamation False Light, and Invasion of Privacy," also brought pursuant to Arizona state Law (Count Two); "Infliction of Emotional Distress—Negligent, Reckless, and Intentional," also brought pursuant to Arizona state law (Count Three); "Violation of [the] Arizona Mugshot Operator Act," also brought pursuant to Arizona state law (Count Four); "Violation of [Plaintiff's] Right of Procedural Due Process (Through the Fourteenth Amendment)," brought pursuant to 42 U.S.C. § 1983 (Count Five); and "Violation of [Plaintiff's] Rights of Substantive Due Process (Through the Fourteenth Amendment)," also brought pursuant to 42 U.S.C. § 1983.

Defendants seek dismissal of the Second Amended Complaint for failure to state a claim, and further assert that Penzone is entitled to qualified immunity.

## II. Legal Standard

Dismissal of a complaint, or any claim within it, for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) may be based on either a "'lack of a cognizable legal theory' or 'the absence of sufficient facts alleged under a cognizable legal theory.'" *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121–22 (9th Cir. 2008) (quoting *Balistreri v. Pacifica Police Dep't,* 901 F.2d 696, 699 (9th Cir. 1990)). In determining whether a complaint states a claim under this standard, the allegations in the complaint are taken as true and the pleadings are construed in the light most favorable to the nonmovant. *Outdoor Media Group, Inc. v. City of Beaumont*, 506 F.3d 895, 900 (9th Cir. 2007). A pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). But "[s]pecific facts are not necessary; the statement need only give the defendant fair notice of what . . . the claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (internal quotation

1  omitted). To survive a motion to dismiss, a complaint must state a claim that is "plausible
2  on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see Bell Atlantic Corp. v.
3  Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff
4  pleads factual content that allows the court to draw the reasonable inference that the
5  defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

6  As a general rule, when deciding a Rule 12(b)(6) motion, the court looks only to the
7  face of the complaint and documents attached thereto. *Van Buskirk v. Cable News
8  Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002); *Hal Roach Studios, Inc. v. Richard Feiner
9  & Co., Inc.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990). If a court considers evidence outside
10 the pleading, it must convert the Rule 12(b)(6) motion into a Rule 56 motion for summary
11 judgment. *United States v. Ritchie*, 342 F.3d 903, 907–08 (9th Cir. 2003). A court may,
12 however, consider documents incorporated by reference in the complaint or matters of
13 judicial notice without converting the motion to dismiss into a motion for summary
14 judgment. *Id.*

15 **III. Discussion**

16 Under 28 U.S.C. § 1367(a), subject to exceptions which are not relevant here,
17 district courts have supplemental jurisdiction over state law claims in any civil action in
18 which the district courts also have original federal jurisdiction over all other claims in the
19 case. But "once judicial power exists under § 1367(a), retention of supplemental
20 jurisdiction over state law claims under § 1367(c) is discretionary." *Acri v. Varian Assoc.,
21 Inc.,* 114 F.3d 999, 1000 (9th Cir. 1997) (en banc). "The district court may decline to
22 exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court
23 has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3).
24 Moreover, the Supreme Court has cautioned that "if the federal claims are dismissed before
25 trial, . . . the state claims should be dismissed as well." *United Mine Workers of America
26 v. Gibbs*, 383 U.S. 715, 726 (1966); *see also Gini v. Las Vegas Metro. Police Dept.*, 40
27 F.3d 1041, 1046 (9th Cir. 1994) (when federal law claims are eliminated before trial, the
28 court generally should decline jurisdiction over state law claims and dismiss them without

prejudice).

Accordingly, before determining whether to exercise supplemental jurisdiction over Plaintiff's state law claims in Counts One through Four, the Court will first evaluate whether Plaintiff has adequately stated federal claims in Counts Five and Six.

### A.     Procedural Due Process (Count Five)

In *Humphries v. County of Los Angeles*, 554 F.3d 1170, 1186 (9th Cir. 2008), *overruled on other grounds by Los Angeles County v. Humphries*, 562 U.S. 29 (2010), the Ninth Circuit observed that

> In procedural due process claims, the deprivation of a constitutionally protected interest "is not itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law.*" *Zinermon v. Burch*, 494 U.S. 113, 125 (1990). Our analysis proceeds in two steps: "the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989) (internal citations omitted).

554 F.3d at 1184-85.

In determining whether a liberty or property interest exists, the Supreme Court has held that a liberty interest may be implicated "where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him." *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971). However, in *Paul v. Davis*, the Supreme Court clarified that procedural due process protections apply to *reputational* harm only when a plaintiff suffers stigma from governmental action plus alteration or extinguishment of "a right or status previously recognized by state law." 424 U.S. 693, 711. This has become known as the "stigma plus" test. *Humphries*, 554 F.3d at 1185. As such, in order to properly state a claim for a violation of procedural due process actionable under § 1983, a plaintiff must allege that they suffered some "stigma," and that, as a result of that stigma, "a right or status previously recognized by state law was distinctly altered or extinguished."

*Id.* at 1186. Mere reputational injury is not sufficient to maintain a procedural due process claim. *Paul*, 424 U.S. at 711; *see also Siegert v. Gilley*, 500 U.S. 226, 233 (1991) (reaffirming that an injury to reputation by itself is not a protected liberty interest under the Fourteenth Amendment).

> i.   Stigma

Plaintiff asserts that the publication of her mugshot and other identifying information on the MCSO website stigmatized her because it "wrongfully implie[d] to the public that [Plaintiff] is guilty of a crime, or at least likely to be guilty of a crime." (Doc. 43 at 6, 35).[4] Taking the allegations in the Second Amended Complaint as true, Plaintiff has sufficiently alleged that she suffered some stigma as the result of the publication of her mugshot and identifying information on the MCSO website. *See Paul*, 424 U.S. at 697, 701 (noting that imputing criminal behavior is generally considered "defamatory per se").

> ii.   Plus

Even if stigmatized by Defendants' actions, Plaintiff must still demonstrate that some "right or status previously recognized by state law was distinctly altered or extinguished." *Humphries*, 554 F.3d at 1186. In clarifying what a procedurally protected "right or status" may consist of, the Supreme Court has pointed to "interests" that are "recognized as protected by state law," such as the right to purchase alcohol if of legal age (*Constantineau*); to drive a motor vehicle with a license (*Bell v. Burson*, 402 U.S. 535 (1971)); the right to remain on parole if compliant with parole requirements (*Morrissey v. Brewer*, 408 U.S. 471 (1972); and to continued public employment (*Bishop v. Wood*, 426 U.S. 341 (1976)).

By comparison, in *Paul*, a local sheriff placed an arrested but untried defendant on a list of "active shoplifters," and distributed the list to local businesses. 424 U.S. at 695-96. The list eventually came to the attention of the man's employer, who warned the man

---

[4] In her Response to Defendants' Motion to Dismiss, Plaintiff clarifies that the "Mugshot Lookup" posting includes a "'Crime Type' instead of words equating to an arrest or pending charges," and that this implies Plaintiff's guilt or likelihood of guilt. (Doc. 49 at 2-3).

- 6 -

1  not to shoplift in the future but did not otherwise take any adverse action against him. *Id.*
2  at 696. The man's charges were later dismissed, and he sued the sheriff on the basis that
3  placing him on the list of "active shoplifters" violated his due process rights. *Id.* The
4  Supreme Court found that any harm to the man's reputation was not sufficient to warrant
5  due process protections because no right or status owed to him had been altered or
6  extinguished because whatever injury he may have suffered was simply incidental to the
7  list having "c[o]me to the attention of [his] supervisor." *Id.* at 696, 711-12.

8  Here, Plaintiff does not allege that she, for example, is no longer able to purchase
9  alcohol, is unable to obtain a driver's license, has been fired from a job, has been denied a
10 lease or credit, or that any other interest "in common with the rest of the citizenry" has
11 been altered or extinguished. Rather, Plaintiff asserts that a more nebulous "right of
12 privacy" has been violated.

13 Plaintiff's claim to a procedurally protected "right of privacy" flows from her
14 interpretation of *Scottsdale Unified School District v. KPNX Broadcasting*, 191 Ariz. 297
15 (Ariz. 1998). Plaintiff asserts that in *Scottsdale*, the Arizona Supreme Court "explicitly
16 granted [Arizona] citizens the right of privacy by holding that the government shall not
17 release birthdates of persons to the public," and that the publication of her mugshot and
18 identifying information (including her birthdate) thus violated her "rights of privacy
19 recognized under Arizona law . . . ." (Doc. 43 at 36, 43).

20 Plaintiff reads too much into *Scottsdale*. In *Scottsdale*, reporters received a tip that
21 a school teacher in a Maricopa County school was a convicted sex offender. 191 Ariz. at
22 299. In order to investigate whether any other sex offenders were employed by Maricopa
23 County schools, the reporters requested the birthdates of all active and substitute public
24 school teachers in 25 separate Maricopa County school districts. *Id.* The school districts
25 declined to provide the requested information, and filed a declaratory action in Arizona
26 state court under Arizona's public records laws seeking an order affirming that the public
27 records laws did not require disclosure of the information. *Id.* The Arizona Supreme Court
28 concluded that "a person, including a public school teacher, has a privacy interest in his or

her birth date." *Id.* at 302. Plaintiff cites this portion of *Scottsdale* as supporting her argument that "the government shall not release birthdates of persons to the public," and that she thus has a "right[] of privacy recognized under Arizona law." (Doc. 43 at 36, 43). The fact that the Arizona Supreme Court recognized a privacy interest in a person's birthdate did not end the analysis in *Scottsdale*, however.

Rather, even accounting for one's privacy interest in his or her birthdate, "[t]he question then becomes whether that interest is sufficient ***in a given case*** to outweigh disclosure, which is presumptively required where public records are concerned." *Scottsdale*, 191 Ariz. at 302 (emphasis added).[5] As such, engaging in the balancing test set forth in *Carlson v. Pima County*, 141 Ariz. 487 (1984), the Court held that "***on the facts of this case***, [the school districts] correctly withheld the teachers' birthdates . . . ." *Id.* at 303 (emphasis added).

As such, *Scottsdale* does not stand for the broad proposition that "the government shall not release birthdates of persons to the public." Rather, it represents only a context-specific application of the *Carlson* balancing test. *Carlson* found that all public records "are presumed open to the public for inspection" and that "access and disclosure is the strong policy of the law." 141 Ariz. at 491.[6] However, recognizing that such access was not unlimited, *Carlson* held that public records are to be freely accessible "subject to the official's discretion to deny or restrict access where recognition of the interests of privacy, confidentiality, or the best interest of the state in carrying out its legitimate activities outweigh the general policy of open access." *Id.*; *see also Scottsdale*, 191 Ariz. at 537 (quoting *Carlson* and noting that, in addition to statutory exceptions to the general policy of free access to public records, the "public right of inspection may also be curtailed in the

---

[5] Plaintiff concedes that her birthdate, mugshot, and other arrest information are public records. (Doc. 43 at 54; Doc. 49 at 7).

[6] Indeed, Defendants point out that the state routinely releases birthdates to the public as part of public records. (Doc. 47 at 5-6, n.2) (noting that Maricopa County Superior Court permits case searches by date of birth, and that name searches return the birth month and year of responsive defendants).

interests of 'confidentiality, privacy, or the best interests of the state.'").

Even accepting that Plaintiff has "a privacy interest" in her birthdate, *Carlson* provides that public records—including a person's birthdate—are presumptively "open to the public" and their withholding is only justified "where recognition of the interests of privacy, confidentiality, or the best interest of the state in carrying out its legitimate activities outweigh the general policy of open access." *Id.* Plaintiff points to no authority applying the *Carlson* balancing test to facts and parties analogous to those present here, or to authority holding that disclosure of a person's birthdate under the circumstances present here is prohibited, and the Court has been unable to locate any.[7] As such, Plaintiff has not demonstrated that any right or status recognized by state law has been distinctly altered or extinguished by Defendants' actions because, simply put, no relevant right or status *has* been recognized by state law. *See Paul*, 424 U.S. at 712 (finding that because state law extended no relevant right or status to the plaintiff, identifying the plaintiff as an "active shoplifter," "however seriously [it] may have harmed [the plaintiff's] reputation, did not deprive him of any 'liberty' or 'property' interests protected by the Due Process Clause.").

Plaintiff also asserts that the United States Supreme Court has "recognized" what Plaintiff refers to as "a privacy right to [her] criminal record or 'rap sheet'" in *U.S. Dep't of Justice v. Reporters Comm. For Freedom of Press*, 489 U.S. 749, 770 (1989). (Doc. 43 at 37). Plaintiff recognizes, however, that *Reporters Committee* only applies "for FOIA purposes." (*Id.*). "The question of the statutory meaning of privacy under the FOIA is, of course, not the same as the question whether . . . an individual's interest in privacy is protected by the Constitution." 489 U.S. at 762 n. 13. Indeed, the *Reporters Committee* Court cited *Paul*, noting that there was "no constitutional privacy right affected by

---

[7] Plaintiff's long discussion of *Marsh v. City of San Diego*, 680 F.3d 1148 (9th Cir. 2012) is thus inapposite. (Doc. 43 at 42-43). As discussed, *Scottsdale* did not hold, as Plaintiff argues, that "the government shall not release birthdates of persons to the public." (*Id.* at 43). As such, *Scottsdale* is neither a "substantive limit on official discretion" nor does it "specify[] the outcome that must be reached if the substantive predicates have been met," as required by *Marsh* before a constitutionally protected, state-created liberty interest will be recognized. 680 F.3d at 1155-56 (citations omitted).

publication of [the] name of [an] arrested but untried shoplifter." *Id.*; *see also Doe v. Garland*, 17 F.4th 941, 947 (9th Cir. 2021) (citing *Reporters Committee* and noting that FOIA exemptions do not create a federal constitutional right to privacy.)

Plaintiff attempts to sidestep this distinction, however, by arguing that "the Arizona Supreme Court adopted *Reporters Commi*[*ttee*] as controlling law for purposes of **Arizona's** public records law," apparently in reference to the Arizona Supreme Court's search for "guidance" in *Scottsdale* from "federal cases that have addressed" FOIA. (Doc. 43 at 39-40) (emphasis in original); *see also* 191 Ariz. at 300-301. Although the *Scottsdale* Court intoned that it "adopt[ed] the analysis by the [United States] Supreme Court for use by Arizona courts in cases arising under [its] own public records law," this is a far cry from Plaintiff's argument that Arizona's public records law is somehow "governed by [] federal FOIA caselaw." (Doc. 49 at 13). Indeed, Judge Martone noted in his concurrence in *Scottsdale* that "[w]hile the federal Freedom of Information Act can be helpful in other contexts, it is not that helpful in deciding whether a birth date raises privacy interests sufficient to overcome the presumption of open records" because FOIA "cases concerning invasions of privacy arise under an exemption . . . that does not exist" under Arizona's public records law. 191 Ariz. at 304 (J. Martone, concurrence in part).

Even construed in the light most favorable to Plaintiff, this construction must fail. If Arizona's public records law is "governed" by *Reporters Committee* and its FOIA brethren (Doc. 43 at 39; Doc. 49 at 13), then that governance must include the distinction between rights protected by FOIA and rights actionable under the Fourteenth Amendment. *Reporters Committee*, 489 U.S. at 762 n. 13 ("The question of the statutory meaning of privacy under the FOIA is, of course, not the same as the question whether . . . an individual's interest in privacy is protected by the Constitution."). Put simply, if *Reporters Committee* declined to find a constitutionally protected due process right even where a person had a privacy interest protected by FOIA, it strains credulity to conclude that *Arizona state public records law* nevertheless imputes a constitutionally protected right *via* FOIA. In any event, as discussed *supra*, *Scottsdale* did not create a constitutionally

protected liberty interest applicable to the facts of this case.

Plaintiff also points to MCSO Policy GF-3 as a basis for her procedural due process claim. (Doc. 43 at 43-44). Plaintiff cites *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005), for the proposition that "a liberty interest protected by the Fourteenth Amendment's Due Process Clause may arise 'from an expectation or interest created by state laws or policies,'" and extrapolating therefrom that MCSO Policy GF-3 provides just such a basis because it provides that "[i]nformation determined to be personal identifying information [including birthdates] … shall be redacted" before publication. (*Id.* at 44) (emphasis in original). However, MCSO Policy GF-3 is neither law nor policy *of the state*. Rather, as its very title indicates, it applies only to the Maricopa County Sheriff's Office, which is not a state entity. Indeed, given that Penzone is—as Plaintiff repeatedly asserts—"the final decision-maker for the County's mugshot policy" (Doc. 43 at 6), Plaintiff's argument implies that the Sheriff could simply do away with this "right" if he chose to revise Policy GF-3. Constitutional protections do not rise and fall at the whims of local officials, however. As such, Plaintiff's further citation to *Mitchell v. Dupnik*, 75 F.3d 517 (9th Cir. 1996) is inapposite. (*Id.* at 44). In *Dupnik*, the Ninth Circuit did not hold that a county sheriff violated a pretrial detainee's rights because, as Plaintiff puts it, "the sheriff failed to follow his own written policy," but rather because that policy violated the federal Constitution. 75 F.3d at 525 ("The elements of due process in a prison disciplinary hearing have long been established by *Wolff v. McDonnell*, 418 U.S. 539 [] (1974), which the district court properly applied in determining that the Jail's witness policy violated [the Plaintiff's] constitutional right."). So too with Plaintiff's citation to *Mendoza v. Blodgett*, where prison policy provided inmates, as Plaintiff puts it, "a right to due process under the Fourteenth Amendment." (Doc. 43 at 44); *citing* 960 F.2d 1425, 1428 (9th Cir. 1992). Put simply, the liberty interests at issue in *Dupnik* and *Mendoza* did not arise from the sheriff's or prison's policy, but from federal law.

Accordingly, Plaintiff has failed to state a procedural due process claim, and Count Five will thus be dismissed.

### B.      Substantive Due Process (Count Six)

Although the Fifth Amendment's Due Process Clause states only that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law," *see* U.S. Const. amend. V, courts have long held that it also provides substantive protections for certain unenumerated fundamental rights. *See e.g. Washington v. Glucksberg*, 521 U.S. 702, 719 (1997) ("The Due Process Clause guarantees more than fair process, and the 'liberty' it protects includes more than the absence of physical restraint."). Indeed, the Supreme Court has a long history of recognizing unenumerated fundamental rights as protected by substantive due process. *See, e.g.*, *Eisenstadt v. Baird*, 405 U.S. 438 (1972) (to use contraception); *Griswold v. Connecticut*, 381 U.S. 479 (1965) (to use contraception, to marital privacy); *Loving v. Virginia*, 388 U.S. 1 (1967) (to marry); *Rochin v. California*, 342 U.S. 165 (1952) (to bodily integrity); *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535 (1942) (to have children); *Pierce v. Society of Sisters*, 268 U.S. 510 (1925) (to direct the education and upbringing of one's children); *Meyer v. Nebraska*, 262 U.S. 390 (1923) (same).

While "[p]retrial detainees have a substantive right against restrictions that amount to punishment, *Valdez v. Rosenbaum*, 302 F.3d 1039, 1045 (9th Cir. 2002) (citing *United States v. Salerno*, 481 U.S. 739, 746 (1987)), this right is only violated if such restrictions are "imposed for the purpose of punishment." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). The *Bell* test asks whether there was an express intent to punish, or "whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]." *Id.* (quoting *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963)).

For a particular governmental action to constitute punishment, (1) the action must cause the detainee to suffer some harm or disability, and (2) the purpose of the governmental action must be to punish the detainee. *Id.* at 538 ("A court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose."). The harm or disability must

either significantly exceed, or be independent of, the inherent discomforts of confinement. *Id.* at 537 ("Loss of freedom of choice and privacy are inherent incidents of confinement in such a facility. And the fact that such detention interferes with the detainee's understandable desire to live as comfortably as possible and with as little restraint as possible during confinement does not convert the conditions or restrictions of detention into 'punishment.'").

        i.     Harm

Plaintiff does not explicitly allege in her Second Amended Complaint that the publication of her mugshot and other information caused her embarrassment or humiliation, merely stating that her "reputation in the business community, as well as in her personal life, has been severely and permanently damaged." (Doc. 43 at 6). Rather, Plaintiff alleges that the "Mugshot Lookup" website is "*designed* to ridicule and punish and harm persons who are supposed to be presumed innocent under the law," without alleging that it *actually* caused her such harm. (Doc. 43 at 45) (emphasis added). Nevertheless, construing the allegations in the light most favorable to Plaintiff, the Court concludes that Plaintiff has alleged that the publication of mugshot and related information caused her shame and humiliation. (*Id.* at 48) ("A public display on the internet that humiliates or shames pretrial detainees such as [Plaintiff] is a form of harm"); *see also* Doc. 49 at 24 ("[Plaintiff's] online reputation has been and continues to be severely damaged."). The Ninth Circuit has concluded that such injuries constitute "harm" for purposes of substantive due process. *Demery v. Arpaio*, 378 F.3d 1020, 1029-30 (9th Cir. 2004) ("humiliation" and "discomfort" constitute "harm" under *Bell* test).[8]

---

[8] While not *de minimus*, the Court notes that this harm is attenuated and based largely on the actions of persons and entities whom Plaintiff has not named as Defendants. Plaintiff alleges that her mugshot and related information was only posted on the MCSO website for approximately three days. (Doc. 43 at 5). Although Plaintiff also alleges that her mugshot and information was "scraped" by third-parties and that she has received — to her personal email account—voluminous spam and other unwanted solicitations, she has not named any of these third-parties as Defendants to this action, nor has she alleged how many people actually viewed her mugshot or other information in the three days it was

### ii.   Purpose

Plaintiff repeatedly asserts in her Second Amended Complaint that "[t]here is no legitimate nonpunitive purpose for the Sheriff publishing the mugshots of pretrial detainees such as [Plaintiff] on the internet." (Doc. 43 at 45).[9] Defendants assert that publication of the mugshot and inclusion of the identifying information allows law enforcement "to identify with specificity those who are booked into their jails for identification purposes rather than allow confusion among people with same or similar names." (Doc. 47 at 9). Defendants also indicate that publication of the mugshot and information—which Plaintiff concedes are public records (Doc. 43 at 54; Doc. 49 at 7)—is consistent with Arizona's public records laws. (Doc. 47 at 14). Plaintiff does not address Defendants' proffered purposes, but instead argues that "Sheriff Arpaio made similar arguments to the position taken by Sheriff Penzone" in *Demery*, and that the Ninth Circuit rejected in that case the rationales of "public scrutiny," "education," "jail security," or to "deter crime." (Doc. 49 at 27-28). Defendants do not proffer any of those rationales here, however, and Plaintiff's failure to address the rationales Defendants *have* proffered leaves them effectively unrebutted. Plaintiff does not, for example, explain how adherence to Arizona state law is not a legitimate governmental purpose. Plaintiff cites three cases[10] for the proposition that

---

posted (along with "over one hundred other individuals who had been arrested on our about that same day" (*id.* at 6)) on the MCSO website, or how any of the third-parties obtained her personal email account.

[9] In her Response, Plaintiff asserts that "one critical fact that this Court must assume as true relates to Plaintiff's specific allegations in her [Second Amended Complaint] that there is no valid nonpunitive state interest in [Defendant Penzone's] publishing [Plaintiff's] mugshot and personal information," and that the Court "*must assume that* [Penzone] *had no valid nonpunitive interest in publishing Plaintiff's mugshot and personal information on the MCSO Website*." (Doc. 49 at 3-4) (emphasis in original). While the Court accepts Plaintiff's *factual allegations* as true for purposes of evaluating Defendants' Motion to Dismiss, the Court need not accept as true *legal conclusions* untethered from factual support. *Iqbal*, 556 U.S. at 678 (courts "are not bound to accept as true a legal conclusion couched as a factual allegation").

[10] *Karantsalis v. U.S. Dept. of Justice*, 635 F.3d 497 (11th Cir. 2011); *World Publishing Co., v. U.S. Dept. of Justice*, 672 F.3d 825 (10th Cir. 2012); and *Detroit Free*

"there is no discernable interest in the government releasing mugshots to the public." (Doc. 49 at 29-30). However, none of these cases are binding precedent, and, more importantly, none discuss substantive due process. Rather, the cases relate to FOIA requests. Plaintiff has not identified, and the Court is not aware of, any precedent holding that FOIA exemptions give rise to federal substantive due process rights. Plaintiff's substantive due process claim must arise, if at all, from the Fourteenth Amendment.

Plaintiff places much weight on *Demery*. In *Demery*, the Ninth Circuit held that the live public broadcast of webcams from inside the Maricopa County Jail violated detainees' substantive due process rights. *Id.* at 1033. Engaging in the *Bell* test, the *Demery* Court found that the detainees suffered harm because the webcasts were humiliating and discomforting, and that the webcasts were punitive because they were "not reasonably related to a nonpunitive purpose." *Id.* at 1029-33. Even there, however, the Ninth Circuit observed that government officials are traditionally afforded "wide latitude," and that ensuring accountability and public scrutiny are "valid governmental interests" that were overcome only on the unique facts in *Demery*. *Id.* at 1031-32. *Demery* does not stand for the general proposition that accountability and public scrutiny are not legitimate, non-punitive purposes for publishing mugshot and arrest information. Indeed, beyond the surface similarities involving the internet and Maricopa County Sheriff's Office, *Demery* involves no discussion of the publication of mugshots, arrest records, or their related information.

Further, citing *Paul*, the *Demery* court "recognize[d]" that "the Supreme Court has held that the disclosure of an arrest record does not violate a constitutionally protected right of privacy." 378 F.3d at 1032 n.6. In distinguishing *Demery* from *Paul*, the Ninth Circuit further observed that "the release of arrest records was not a condition of pretrial detention," and that "[m]ore importantly, there is a stark difference between releasing an arrest record and thereby publicizing only 'the fact of [a detainee's] arrest' . . . and streaming live images of a pretrial detainees every movement across the broad spectrum of

---

*Press, Inc. v. U.S. Dept. of Justice*, 829 F.3d 478 (6th Cir. 2016).

the internet." *Id.* (internal citation omitted).  Indeed, *Paul* squarely forecloses Plaintiff's claim, holding that

> While there is no 'right of privacy' found in any specific guarantee of the Constitution, the Court has recognized that 'zones of privacy' may be created by more specific constitutional guarantees and thereby impose limits upon government power.  Respondent's case, however, comes within none of these areas. . . . And our other 'right of privacy' cases, while defying categorical description, deal generally with substantive aspects of the Fourteenth Amendment. . . . The activities detailed as being within this definition were ones very different from that for which respondent claims constitutional protections—matters relating to marriage, procreation, contraception, family relationships, and child rearing and education.  In these areas it has been held that there are limitations on the States' power to substantively regulate conduct.
>
> Respondent's claim is far afield from this line of decisions.  He claims constitutional protection against the disclosure of the fact of his arrest on a shoplifting charge.  His claim is based, not upon any challenge to the State's ability to restrict his freedom of actions in a sphere contended to be 'private,' but instead on a claim that the State may not publicize a record of an official act such as an arrest.  None of our substantive privacy decisions hold this our anything like this, and we decline to enlarge them in this manner.

424 U.S. at 712-13 (internal citations omitted).

As such, because Plaintiff has failed to rebut the proffered purposes behind the publication of her mugshot and associated information, points to no other authority holding that the publication of mugshots and associated arrest information is punitive, and because her claim is foreclosed by *Paul*, the Court will dismiss Count Six.

**C.   State Law Claims**

As noted at the outset, the remainder of Plaintiff's claims arise pursuant to Arizona state law.  Because the Court has determined that Plaintiff has failed to state any federal causes of action, the Court declines to exercise supplemental jurisdiction over Plaintiff's

remaining state law claims in Counts One through Four, and will thus dismiss those claims without prejudice. 28 U.S.C. § 1367(c)(3); *Gibbs*, 383 U.S. at 726 ("if the federal claims are dismissed before trial, . . . the state claims should be dismissed as well."); *Gini,* 40 F.3d at 1046 (when federal law claims are eliminated before trial, the court generally should decline jurisdiction over state law claims and dismiss them without prejudice).[11]

### IV.    Dismissal Without Leave to Amend

For the reasons stated herein, Defendants' Motion to Dismiss will be granted as to Counts Five and Six, and the Court will decline supplemental jurisdiction over the remaining Counts.[12] Further, because Plaintiff's federal causes of action fail as a matter of law and cannot be remedied by additional factual allegations, the Court will dismiss the Complaint and this action.

**IT IS ORDERED:**

(1)    The reference to the Magistrate Judge is **withdrawn** as to Defendants' Motion to Dismiss (Doc. 47).

. . . .

. . . .

. . . .

. . . .

. . . .

---

[11] Because the Court concludes that Plaintiff has failed to allege a federal cause of action, and because it will decline jurisdiction over Plaintiff's state law claims, the Court does not reach Defendants' additional argument that Penzone is entitled to qualified immunity.

[12] The Court notes that it similarly declined to exercise supplemental jurisdiction over Plaintiff's state law claims when it granted Defendants' previous Motion to Dismiss Plaintiff's First Amended Complaint. (Doc. 42 at 14). Plaintiff thus had the opportunity to address whether the Court should retain supplemental jurisdiction over her state law claims if the federal claims in her Second Amended Complaint were similarly dismissed, but she failed to address the issue. *Ho v. Russi*, No. 20-55915, 2022 WL 3570597, at *2 (9th Cir. Aug. 19, 2022).

(2) Defendants' Motion to Dismiss (Doc. 47) is **granted**, and this action is dismissed without prejudice. The Clerk of Court must enter judgment accordingly.

Dated this 6th day of September, 2023.

_____
Douglas L. Rayes
United States District Judge